## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **TAMARA WILSON**, as Administratrix of the Estate of **JOHNNY HOLLMAN, SR.**, deceased and **BETTY MORRIS**, individually, and as the surviving spouse of **JOHNNY HOLLMAN, SR,** Decedent, <br><br>             **Plaintiffs**, <br> **v.** <br> **CITY OF ATLANTA, GEORGIA**, a municipal corporation of the State of Georgia, **CHIEF DARIN SCHIERBAUM**, in his individual capacity and official capacity, and **KIRAN KIMBROUGH**, individually, <br><br>             **Defendants**. | **JURY TRIAL DEMANDED** <br><br><br> CIVIL ACTION FILE NO. |

## COMPLAINT

**COME NOW** Plaintiffs Tamara Wilson and Betty Morris (hereinafter "Plaintiffs"), by and through their undersigned counsel of record and hereby file this Complaint for Damages arising out of Defendants' unlawful use of excessive force against Johnny Hollman, on August 10-11, 2023, resulting in Mr. Holloman's death, showing this Honorable Court as follows:

## INTRODUCTION

1.      Plaintiffs bring this civil action seeking damages pursuant to 42 U.S.C. § 1983 for Defendants' violations of Plaintiffs' federal rights as guaranteed by the First, Fourth, and Fourteenth Amendments of the United States Constitution and for violations of Georgia law.

## PARTIES AND JURISDICTION

2.      Plaintiff Tamara Wilson is the administrator of the estate of Johnny Hollman, deceased (hereinafter sometimes referred to as "Deacon Hollman").

3.      At all relevant times herein, Plaintiff Betty Morris was the surviving spouse ("wife") of Johnny Hollman, deceased.

4.      Plaintiffs reside in the Northern District of Georgia.

5.      Defendant City of Atlanta (the "City") is a municipal corporation and political subdivision of the State of Georgia and exercises its police powers through the Atlanta Police Department ("APD"). The City may be served with this Complaint by service upon Mayor Andre Dickens at 55Trinity Avenue SW, Atlanta, Georgia 30303.

6.      Plaintiffs provided timely ante litem notice of their claims to the City on or about October 13, 2023. The City of Atlanta failed to respond in writing or otherwise to the Notice.

7.      Attached hereto as Exhibit "A" is the ante litem notice provided to the City of Atlanta.

8.      Attached hereto as Exhibit "B" is proof of receipt by the City of Atlanta of the ante litem notice.

9.      At all times material hereto, Darin Schierbaum was the Chief of Police for the City of Atlanta's Police Department and was acting in his capacity as the final policymaker for the City with regard to its performance of police functions. Upon information and belief, Chief Schierbaum is currently the Chief of Police of the City of Atlanta's Police Department. When service is made upon Chief Schierbaum as required by law, he will be subject to the jurisdiction of this Court.

10.      At all times material hereto, Defendant Kiran Kimbrough was a law enforcement officer employed by the City of Atlanta and was acting under color of state law within the scope of his duties as such. Defendant Kimbrough is being sued in his individual capacity. Defendant Kimbrough may be served with this Complaint by service upon him at _____ (address intentionally omitted). When served in the manner prescribed by law, Defendant Kimbrough shall be subject to the jurisdiction and venue of the Court.

11.      The Defendants are both citizens of the State of Georgia, and at least one of them resides within the Northern District of Georgia.

12.     Upon service of the summons and complaint in a manner prescribed by law, Defendants shall be properly subject to the personal jurisdiction of the Court.

13.     The subject incident occurred within the Northern District of Georgia, Atlanta Division. Venue is therefore proper in this court.

14.     The Court has subject matter jurisdiction over this action.

## **FACTUAL ALLEGATIONS**

15.     This is an action for the needless and wrongful death of Deacon Johnny Hollman, Sr., a beloved 62-year-old husband, father, grandfather, great grandfather, church deacon board chair, lay minister, and community leader (hereafter "Deacon Hollman").

## THE INCIDENT

16.     During the evening hours of August 10, 2023, Defendant Kimbrough was dispatched to the scene of a minor vehicular accident that occurred in the City of Atlanta.

17.     Mr. Johnny Hollman, Sr. ("Deacon Hollman"), was involved in a minor traffic accident while end route home after leaving a virtual (Facebook) Bible study session sponsored by his Church, Lively Stones of God Ministries.

18.     Deacon Hollman participated in the virtual session from his vehicle that was parked in front of his daughter, Arnitra's, apartment.

19.    Upon conclusion of the Bible study session Deacon Holloman bade goodbye to Arnitra in the parking lot. He then went to a fast-food establishment near his home to pick up food for his wife, Betty Morris. After picking up the food he resumed the short drive to his nearby home. Thereafter, the minor auto accident occurred.

20.    Both Deacon Hollman and the other motorist called 911 to report the accident.

21.    During Deacon Hollman's 911 call he reported that neither driver was hurt, and that no ambulance service was required.

22.    During their respective calls to 911 the two drivers disputed who was at fault for the low impact collision.

23.    Deacon Hollman and the other motorist waited, however, without incident, for over an hour, for a City of Atlanta Police officer to arrive.

24.    Defendant and former Atlanta Police Department ("APD") Officer Kiran Kimbrough ultimately responded to investigate the minor traffic accident.

25.    At some point, before arriving at the scene, Defendant Kimbrough activated his body-worn camera.

26.    It is unclear at this point what investigation Defendant Kimbrough undertook once at the scene, but he ultimately advised Deacon Hollman that it was his determination that Hollman was at fault for the accident and was issuing him a citation.

27. Several exchanges then occurred in which Officer Kimbrough directed Deacon Hollman to sign the traffic citation.

28. Deacon Hollman did not explicitly refuse to sign the citation, but in each instance when directed to do so, responded that the collision was not his fault.

29. At most, all that could be said is that Deacon Hollman hesitated in signing the citation.

30. Defendant Kimbrough then advised Deacon Hollman that his court date for the traffic citation would be October 4, 2023, at 8:00 a.m.

31. Deacon Hollman continued to maintain that he had done nothing wrong.

32. Defendant Kimbrough then directed Deacon Hollman to lower his voice.

33. Explaining the volume of his voice, Deacon Hollman responded that he had a "heavy voice."

34. Deacon Hollman then asked to speak with Defendant Kimbrough's sergeant.

35. Defendant Kimbrough then told Deacon Hollman to sign the ticket, or he would go to jail.

36. Deacon Hollman then used his cell phone to call one of his daughters, Arnitra Hollman.

37. Seeing Deacon Hollman using the phone, Defendant Kimbrough commented that he didn't care whether Deacon Hollman was calling his "priest" or his "wife," and insisted that Deacon Hollman was going to sign the traffic ticket.

38.  Deacon Hollman was able to reach his daughter Arnitra and she was able to listen in on what next transpired thereafter between Defendant Kimbrough and Deacon Hollman.

39.  Defendant Kimbrough then directed Deacon Hollman again to "sign the ticket."

40.  Defendant Kimbrough then began walking toward Deacon Hollman.

41.  As Defendant Kimbrough walked toward Deacon Hollman, two virtually simultaneous events occurred. Defendant Kimbrough reached out to grab one of Deacon Hollman's arms – Deacon Hollman stated (with equal volume in his voice, as before), "I'll sign the ticket."

42.  Deacon Hollman then said twice more that he would sign the ticket.

43.  While Defendant Kimbrough was holding Deacon Hollman's right arm, Deacon Hollman asked, "How can I sign?" Deacon Hollman then stated that he was "right-handed," suggesting that because Defendant Kimbrough was holding his right arm it was physically impossible for him to sign the ticket.

44.  Ignoring Deacon Hollman's concession to his request that he sign the ticket, Defendant Kimbrough performed a leg sweep maneuver on Deacon Hollman, taking Deacon Hollman to the ground." While doing so, Defendant Kimbrough commented to Deacon Hollman: "You acting crazy!"

45. Once on the ground, Deacon Hollman told Defendant Kimbrough, "I'm an old man."

46. Unmoved, Defendant Kimbrough continued his physical assault on Deacon Hollman, at one point striking him in the back of the head, at least twice, with his closed fist.

47. Even while on top of Deacon Hollman's body and trying to handcuff him, Officer Kimbrough shouted at Mr. Hollman: "Sign the ticket!"

48. By this point, however, Deacon Hollman had stated three times that he would sign the ticket.

49. Defendant Kimbrough then angrily told Deacon Hollman: "I'm going to tase you!"

50. Following through on his promise, Defendant Kimbrough then proceeded to tase Deacon Hollman in what appeared to be the Taser's drive stun mode.[1]

51.  After tasing Deacon Hollman, Defendant Kimbrough shouted to him to put his hands behind his back.

52. At that point Deacon Hollman cried out, more than once, "I need help!"

53. Appearing to make a reference to his asthma, Deacon Hollman repeatedly stated, "I can't breathe."

---

[1] In "drive stun" mode, the Taser works more like a conventional stun gun: press it against a person's body, pull the trigger, and it delivers a powerful shock akin to a cattle prod. It doesn't cause paralysis but sends an electric jolt that causes intense pain.

54.  In comparison to shortly before, Deacon Hollman's ability to amplify his voice, appeared to be clearly compromised, as he complained, with increasing desperation in his voice, of an inability to breathe.

55.  Deacon Hollman, the elderly citizen, stated between thirteen (13) and fifteen (15) times, "I can't breathe."

56.  Ignoring Deacon Hollman's repeated claims that he could not breathe, Defendant Kimbrough continued his attempt to handcuff Deacon Hollman, telling him to put his hands behind his back.

57.  Defendant Kimbrough then stated to Deacon Hollman: "I'm going to tell your ass one more time, put your hands behind your back."

58.  Defendant Kimbrough then arced the taser toward Deacon Hollman, causing it to make a loud, frightening, buzzing sound.

59.  Deacon Hollman then repeated, "I can't breathe."

60.  Defendant Kimbrough then directed: "Put your hands behind your back! Now!"

61.  Deacon Hollman then stated, "I can't breathe."

62.  Defendant Kimbrough then tased Deacon Hollman again.

63.  By now, Deacon Hollman was on the ground, on his left side, with his hands apparently behind his back.

64. At this point, Defendant Kimbrough was apparently assisted by a citizen, a tow truck driver, dispatched to the scene who aided in his effort to handcuff Deacon Hollman and turn him onto his stomach.

65. The tow truck driver straddled the citizen's head and neck while assisting Defendant Kimbrough.

66. Defendant Kimbrough did nothing to reject the citizen's assistance in connection with Deacon Hollman.

67. Defendant Kimbrough readily accepted the tow truck driver's assistance in connection with Deacon Hollman.

68. Defendant Kimbrough observed the tow truck driver straddle and sit on Deacon Hollman's head and neck.

69. Defendant Kimbrough observed the tow truck driver physically grabbing one of Deacon Hollman's arms, while Deacon Hollman was lying prone on the ground.

70. Defendant Kimbrough observed the tow truck driver assist him in handcuffing Deacon Hollman.

71. Defendant Kimbrough did nothing to prevent the tow truck driver from straddling and sitting on Deacon Hollman's head and neck.

72. Defendant Kimbrough did nothing to discourage the tow truck driver from straddling and sitting on Deacon Hollman's head and neck.

73. Deacon Hollman stated between thirteen (13) and fifteen (15) times that he could not breathe.

74. While Defendant Kimbrough and the tow truck driver were handcuffing Deacon Hollman, the tow truck driver remained on top of Deacon Hollman's body, continuing to straddle and sit on his head and neck.

75. Defendant Kimbrough and the tow truck driver completed the handcuffing of Deacon Hollman.

76. While completing the handcuffing process, a person can be heard on an apparent police radio observing that the tow truck driver was assisting the officer. It appears that the person who made this comment was able to see the scene, as by that point, neither Defendant Kimbrough nor the tow truck driver had identified the driver as assisting Defendant Kimbrough.

77. Shortly after Defendant Kimbrough and the tow truck driver had physically suppressed and handcuffed Deacon Hollman, Deacon Hollman remained motionless.

78. Defendant Kimbrough advised the person on the radio: "Radio step it up. This guy's bleeding pretty bad."

79. Deacon Hollman's daughter, Arnitra, arrived at the scene to see her father on the ground, motionless. Unfortunately, she had heard on her cell phone much

of the interaction described above. She likely would have been on the phone with her father at the time he took his last conscious breath.

80. Arnitra Hollman was on the phone with her father for seventeen minutes and forty-six seconds (17:46).

81. Emergency medical personnel were summoned to the scene. Deacon Hollman was transported to Grady Memorial Hospital.

82. Deacon Johnny Hollman was pronounced dead at Grady Memorial Hospital on August 11, 2023, at 12:53 a.m.

83. At the time of his death, Deacon Johnny Hollman was a beloved 62-year-old husband, father, grandfather, great grandfather, church deacon board chair, lay minister, and community leader.

84. An autopsy was performed on Deacon Hollman's body.

85. The medical examiner concluded that Deacon Hollman's manner of death was homicide, i.e., a death caused by the actions of another person.

86. The medical examiner's autopsy report showed that Deacon Hollman sustained the following injuries: lacerated tongue; abrasions to the head; contusions to the back; contusions to the torso; subcutaneous hemorrhages to the left hip; contusions to the right shoulder; subcutaneous hemorrhages to left shoulder; contusions to the right elbow; subcutaneous hemorrhages to the left

elbow; contusions to the right forearm; wound to the right hand; and multiple abrasions to the knees.

87.   Defendant Kimbrough was terminated from his employment with the City of Atlanta's Police Department following his interaction with Deacon Hollman.

88.   The official reason given for Defendant Kimbrough's termination was that he failed to summon a sergeant to the scene as requested by Deacon Hollman, before effecting Deacon Hollman's arrest.

**MAYOR ANDRE DICKENS WEIGHS IN**

89.   Following Mr. Hollman's death, Atlanta Mayor Andre Dickens issued the following statement:

*Every single life in Atlanta is important and matters to me. Every single death in this city weighs on my heart.*
*What started as a routine stop after an accident ended in the death of 62-year-old Johnny Hollman.*
*Immediately following these events, I directed Chief Darin Schierbaum to conduct a top-to-bottom evaluation of the interaction with Mr. Hollman including a review of the department's Standard Operating Procedures and training curriculum. APD leadership will ensure that the officer involved will receive due process. In the coming days we will share the results of those findings and updates to the standard operating procedures of APD.*
*I have been in touch with the family of Mr. Hollman to express my condolences and the City has provided assistance to them.*
*My prayers remain with the family and loved ones of Mr. Hollman and with the entire city of Atlanta.*
*Atlanta Mayor Andre Dickens*

## RESULTS OF THE TOP-TO-BOTTOM EVALUATION

On September 8, 2023, at 4:11 p.m., the City of Atlanta, through its Police Department, issued the following statement:

**APD Statement regarding Johnny Hollman**

**232221937**

**Post Date:**09/08/2023 4:11 PM

APD Statement:

Today, the family and legal representatives for Mr. Johnny Hollman were shown body worn camera footage of an August 10, 2023, interaction between Mr. Hollman and an Atlanta Police Department officer.

The department will share the results of both the GBI and the APD investigations into the death of Mr. Hollman upon their conclusions.

At the direction of Mayor Dickens APD conducted a top-to-bottom evaluation of the interaction with Mr. Hollman, including a review of the department's Standard Operating Procedures and training curriculum. As a result of that review, there have been updates to the standard operating procedures of APD regarding traffic citations, to allow officers to write "refusal to sign" in the signature line, rather than make an arrest.

If a traffic citation is issued:

APD officers will have the driver sign the citation only to acknowledge receipt of the citation and awareness of the court date. If the violator refuses to sign the citation, the APD officer will inform the driver that signing the citation is not an admission of guilt. (O.C.G.A. 40- 13-2.1).

However, if the driver still refuses to sign the citation, the APD officer will write "refusal to sign" in the signature line in Section IV, Summons of the Uniform Traffic Citation, and issue a copy of charges in lieu of a physical arrest.

The Atlanta Police Department continues to strive to earn and retain the trust of the communities we are sworn to protect and serve.

Our thoughts are with the Hollman family.

Previously released:

On August 10, 2023, at around 11:20 PM, an Atlanta Police Officer was dispatched to a motor vehicle accident at Cunningham Place and Joseph E. Lowery Blvd in Southwest Atlanta. Multiple calls had been made regarding the accident, prior to police arrival.

Upon arrival, the APD officer conducted an investigation and determined the at-fault driver. The officer attempted to issue a traffic citation to the at-fault driver. However, the driver became agitated and uncooperative. The officer attempted to take the driver into custody, but he resisted, and a struggle ensued. After several minutes struggling with the driver, the officer utilized his taser and, with the help of a witness, placed him into handcuffs. Once the driver was in handcuffs, the officer realized he was unresponsive and requested EMS to the scene. The driver was taken to Grady Hospital and has been pronounced deceased.

The Georgia Bureau of Investigation was requested to conduct an independent investigation into the incident. The Atlanta Police Department has opened an internal investigation into the incident and the officer has been placed on administrative leave, as is standard policy. At this time, the investigation continues.

Please keep in mind that the information released is preliminary in nature and could change as the investigation progresses or new information comes to light.

911 Audio: 911 Audio Traffic Accident at Cunningham and Joseph E Lowery

Reports: https://cityofatlanta-my.sharepoint.com/:b:/g/personal/jchafee_atlantaga_gov/ERgcQlKPiRhIqMtnGPISxEsB5NbI5WUoLI-CzjqfGEHbow?e=mi4544

Statement:
Our hearts go out to the family and friends of Mr. Johnny Hollman. It is troubling anytime that someone dies while interacting with a police officer. We take instances like this very seriously, and we understand the importance of an independent, thorough investigation. We owe that to the person's loved ones, and we owe that to the community. The GBI's independent investigation into the death of Mr. Hollman remains open, and we will await their findings.

90. Defendant City of Atlanta's new citation signing policy expressly prohibits the arrest of a citizen for mere refusal to sign a traffic citation.

91. Defendant City of Atlanta's new policy is a virtual concession that Defendant Kimbrough acted improperly.

92. Deacon Hollman never explicitly refused to sign the traffic citation.

93. At most, all Deacon Hollman did, before explicitly stating three times that he would sign the citation, was hesitate in signing the citation.

## **DEACON HOLLMAN SHOULD NEVER HAVE BEEN TASED**

94. On August 10, 2023, the City of Atlanta's Police Department had specific rules governing an officer's use of a Taser against a citizen. It is indisputable that Officer Kimbrough violated those rules, and in doing so, caused, or contributed to the death of Deacon Johnny Hollman.

95. Axon Enterprise, Inc., is the manufacturer of the Taser. Its instructional materials describe the Taser, when used in drive stun mode, as a "pain compliance option."

96. Officer Kimbrough did not tase him until after Deacon Hollman stated three times that he would sign the ticket.

97. There was no reason whatsoever, for Officer Kimbrough to use the drive stun mode to get Deacon Hollman to comply with something he had already agreed to do.

98. According to the City of Atlanta's Conducted Energy Weapon (CEW or Taser, as it is more commonly known), codified at APD.SOP.3042 at Subsection 4.3.1 a taser should be used only in two primary circumstances: 1) where the "subject initiates active physical resistance to defeat an officer's ability to affect (sic) an arrest"; and 2) where the "subject makes overt, hostile, attacking

movements with or without a weapon with the intent and ability to cause harm to the officer or others."

99. Deacon Hollman never initiated active physical resistance to defeat Defendant Kimbrough's ability to make an arrest.

100. Deacon Hollman never made any overt, hostile, attacking movements with or without a weapon with the intent and ability to cause harm to Defendant Kimbrough or others.

101. Further, according to APD's Taser policy at subsection 4.2.3, the purpose of a Taser "deployment is to prevent further escalation of a situation and to minimize injury to the officer, suspect, or a third party."

102. There was no situation for Defendant Kimbrough to de-escalate.

103. Prior to Defendant Kimbrough physically grabbing Deacon Hollman there was no danger of injury to Defendant Kimbrough or any third party.

## **THE FORCE USED AGAINST DEACON HOLLMAN WAS EXCESSIVE AND CAUSED OR CONTRIBUTED TO HIS DEATH**

104. A § 1983 claim for excessive force arises from the Fourth Amendment's protection "against unreasonable … seizures," Graham v. Connor, 490 U.S. 386, 394, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989). An officer's use of force is excessive under the Fourth Amendment if the use of force was

"objectively [un]reasonable in light of the facts and circumstances confronting" the officer. Id. at 397.

105.   The Fourth Amendment's freedom from unreasonable seizures encompasses the right to be free from excessive force during an arrest, Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002) [Doc 20-1 at page 15].

106. A "claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of [a] person" is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388 (1989); see also Scott v. Harris, 550 U.S. 372, 381 (2007).

107. "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," Bell v. Wolfish, 441 U.S. 520, 559 (1979).

108. When evaluating the constitutionality of an arresting officer's use of force, courts must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the government's interest in safely apprehending the suspect, Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (citation omitted).

109. This is a necessarily fact-intensive inquiry that requires courts to consider (1) "the severity of the crime at issue," (2) "whether the suspect poses an

immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight," Id. ("Graham v. Connor factors").

110. Taking the above factors into account, Defendant Kimbrough's use of force against Deacon Hollman was excessive.

111. Both tasing, as well as the use of physical force, may constitute excessive force under the Graham v. Connor factors, Stryker v. City of Homewood, 978 F.3d 769, 773 (11th Cir. Oct. 20, 2020).

112. When measured against the Graham v. Connor factors, the force Officer Kimbrough used against Deacon Hollman was constitutionally excessive.

113. Here, the alleged crime at issue was Deacon Hollman's alleged refusal (hesitation) to sign a ticket.

114. Under the first of the Graham v. Connor factors, such refusal (hesitation), standing alone, would not constitute a crime of sufficient severity to either authorize or warrant the use of any degree of force against Deacon Hollman, whether such force was in the form of a tasing or the application of physical force.

115. As for the second Graham v. Connor factor, Deacon Hollman did not pose an immediate threat to the safety of Defendant Kimbrough or any other person.

116. As for the final <u>Graham v. Connor</u> factor, Deacon Hollman did not actively resist arrest or attempt to evade arrest by flight.

117. Deacon Hollman applied no level of force to Defendant Kimbrough.

118. If Deacon Hollman's refusal (hesitation) to sign the ticket could be considered resisting arrest, it is well established under the law that "resisting arrest without force does not connote a level of dangerousness that would justify a greater use of force," <u>Fils v. City of Aventura</u>, 647 F.3d 1272, 1288 (11th Cir. July 28, 2011).

119. Deacon Hollman applied no force to Defendant Kimbrough, including in the form of active resistance or evading arrest.

120. Defendant Kimbrough was not constitutionally justified in tasing Deacon Hollman, handcuffing him, or applying any physical force to him, let alone force that caused Deacon Hollman's death.

121. Defendant Kimbrough ended Deacon Hollman's life over a traffic ticket.

122. Constitutional law establishes that Defendant Kimbrough violated Deacon Hollman's civil rights.

123. Defendant Kimbrough also violated the City of Atlanta Police Department's own Standard Operating Procedures in his encounter with Deacon Hollman.

124. The Atlanta Police Department's Use of Force Policy is codified as APD.SOP.3010. At subsection 2.1 it provides: "The Atlanta Police Department

recognizes and respects the value of human life and the right of people to be secure in their persons and property. Sworn employees, who in the performance of their duties, encounter situations where the use of force reasonably appears necessary to affect (sic) an arrest or detention, overcome resistance, control a subject, or protect themselves or others from injury or death will only use that force which is reasonably necessary in order to accomplish lawful objectives."

125. Tasing a sixty-two-year-old church deacon board chair and causing his death, because he hesitated in signing a traffic citation, does not comport with this policy.

126. Subsection 4.1.1 of APD.SOP.3010 provides that "[I]n all interactions, officers will strive to employ de-escalation[2] techniques taught by the training academy to utilize the least amount of force necessary. They are expressly prohibited from the unnecessary or unreasonable use of force against any person or property."

127. Defendant Kimbrough failed to adhere to this requirement.

---

[2] Subsection 5.3 of APD.SOP.3010 defines de-escalation as: "the practice by taking action to stabilize the situation and reduce the immediacy of the threat so that more time, options, and resources are available to resolve the situation.  The goal of de-escalation is to gain the voluntary compliance of subjects, when feasible, and thereby reduce or eliminate the necessity to use physical force."

128. Once Deacon Hollman stated (three times) that he would sign the ticket, basic de-escalation techniques would have required Defendant Kimbrough to allow him to sign the ticket, rather than grab him, forcefully take him to the ground, repeatedly tase him, ignore his pleas that he could not breathe, then ultimately be the architect of his death.

129. The force Defendant Kimbrough used against Deacon Hollman was purely retaliatory because his sensibilities had been offended by someone who exercised his right of free speech to contest his conclusion about the cause of the collision and requested the presence of his sergeant.

130. "Employees [of the City of Atlanta Police Department] are strictly prohibited from using [retaliatory force] against subjects," APD.SOP.3010 (4.1.14 (1)).

131. Defendant Kimbrough was required to comply with Subsection 4.1.7 of the City of Atlanta Police Department's Use of Force Policy. This policy provides: "An employee's ultimate goal with every encounter involving a suspect is to gain voluntary compliance without having to use any of the APD approved use of force options. Warnings should be given to the subject and opportunities for compliance made available when it does not pose a threat to the safety of the employee."

132. In this instance, Defendant Kimbrough achieved his ultimate goal, as Deacon Hollman stated three times that he would sign the ticket.

133. Deacon Hollman's repeated agreement to sign the traffic citation, posed no threat to Defendant Kimbrough's safety.

134. Defendant Kimbrough's duty to continue to de-escalate the situation did not end in the millisecond before Deacon Hollman stated that he would sign the ticket.

135. Under subsection 4.2.1 of the APD Use of Force Policy, an officer's duty to de-escalate the situation continues "throughout the entire encounter" with a citizen and the officer must "exhaust other means reasonably available in order to prevent the use of deadly force."  Defendant Kimbrough failed to comply with this policy.

136. The force Defendant Kimbrough employed against Deacon Hollman for his perceived refusal to sign a traffic citation, was plainly excessive, wholly unnecessary, and indeed, grossly disproportionate under the Graham v. Connor factors.

137. The force Defendant Kimbrough used against Deacon Hollman was constitutionally excessive and was a direct and proximate cause of Deacon Hollman's death.

## COUNT I
## The City of Atlanta is Liable for Defendant Kimbrough's Neglect to Perform or Improper Performance of Ministerial Duties

138. Defendant City of Atlanta is liable to the Plaintiffs for Defendant Kimbrough's neglect to perform or improper performance of ministerial duties.

139. A municipal corporation may be liable for neglect to perform or improper performance of ministerial duties, O.C.G.A. § 36-33-1(b).

140. A ministerial duty is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty.

141. On August 10-11, 2023, Defendant Kimbrough neglected to perform or improperly performed certain ministerial duties with respect to Deacon Johnny Hollman.

142. Defendant Kimbrough's ministerial violations are set forth below.

143. ADP.SOP.3089 is titled "Supervisor Notification." "The intent of this directive is to provide officers and supervisors with situations where supervisor presence or notification is required."

144. ADP.SOP.3089(3.1) provides that "[a]ell supervisors are to be notified by officers in all the situations listed in section 4.1."

145. ADP.SOP.3089(4.1.1), subsection 18, requires that an officer must notify a supervisor "[w]hen a citizen requests the presence of a supervisor."

146. Deacon Hollman requested of Defendant Kimbrough that an APD supervisor come to the scene of the August 10, 2023 traffic accident.

147. Deacon Hollman made at least two (2) requests of Defendant Kimbrough to notify a supervisor and to have a supervisor present at the scene.

148. A citizen's request for the presence of a supervisor would have required the supervisor to give his or her estimated time of arrival and respond directly to the scene. (APD.SOP.3089 (4.2.1.))

149. Awaiting the arrival of a supervisor would not have posed an immediate threat to the safety of Defendant Kimbrough or others.

150. Deacon Hollman requested the notification and presence of an APD supervisor before Defendant Kimbrough physically grabbed him by the arm.

151. Deacon Hollman requested the notification and presence of an APD supervisor before Defendant Kimbrough performed a leg sweep maneuver on him and took him to the ground.

152. Deacon Hollman requested the notification of an APD supervisor before Defendant Kimbrough twice struck him in the head with a closed fist.

153. Deacon Hollman requested the notification and presence of an APD supervisor before Defendant Kimbrough tased him.

154. Deacon Hollman requested the notification and presence of an APD supervisor prior to Defendant Kimbrough initiating any effort to arrest him.

155. Deacon Hollman requested the notification and presence of an APD supervisor before Defendant Kimbrough handcuffed him.

156. Deacon Hollman requested the notification and presence of an APD supervisor prior to Defendant Kimbrough allowing a tow truck driver to assist him in physically subduing and arresting Deacon Hollman.

157. The requirement that an officer notify a supervisor is mandatory when requested to do so by a citizen.

158. Notifying a supervisor is a simple, absolute, and definite act when a citizen has requested the presence of a supervisor.

159. The act of an officer notifying an APD supervisor is a ministerial act once a citizen requests notification of a supervisor.

160. ADP.SOP.3089(3.1) mandates that a supervisor "be present in all the situations listed in Section 4.2…"

161. One of the Situations listed in Section 4.2.1 occurs "[w]hen an arrestee, complainant, or other citizen requests to have a supervisor present."

162. The requirement that a supervisor be present is mandatory once a citizen makes a request to the officer for a supervisor to be present.

163. An officer's requesting the presence of a supervisor is a simple, absolute, and definite act when a citizen has requested the presence of a supervisor.

164. An officer's requesting the presence of a supervisor at the scene is a ministerial act once a citizen makes a request of the officer for a supervisor to be present.

165. Upon information and belief, Defendant Kimbrough's body-worn camera video feed was being monitored in real-time by one or more officials with Defendant City of Atlanta's Police Department.

166. Person(s) employed by Defendant City of Atlanta would have been aware, in real-time, of Deacon Hollman's requests for an APD supervisor to be present at the scene.

167. Neither Defendant Kimbrough nor any person(s) monitoring Defendant Kimbrough's real-time body worn camera video feed called for a supervisor to be notified and/or be present at the scene.

168. In early October 2023 City of Atlanta Police Chief Darin Schierbaum announced that Defendant Kiran Kimbrough was fired after an internal investigation.

169. In a statement, the Atlanta Police Department said that former officer Kimbrough "violated standard operating procedure when he failed to have a supervisor on the scene prior to proceeding with the physical arrest [of Deacon Johnny Hollman, Sr.]."

170. Defendant Kimbrough's failure to notify a supervisor to come to the scene prior to proceeding with the physical arrest of Deacon Hollman violated a ministerial duty.

171. Defendant Kimbrough's failure to have a supervisor physically present at the scene prior to proceeding with the physical arrest of Deacon Hollman violated a ministerial duty.

172. Defendant Kimbrough's ministerial failures as cited herein are attributable to Defendant City of Atlanta as his employer.

173. Defendant City of Atlanta is liable for Defendant Kimbrough's ministerial failures.

174. Defendant City of Atlanta is liable for the ministerial failures of the person or persons who were monitoring Defendant Kimbrough's body-worn camera video.

175. Defendant City of Atlanta is liable for the ministerial failures of the person or persons who were monitoring Defendant Kimbrough's body-worn camera video and who did not notify a supervisor to come to the scene before Defendant Kimbrough proceeded with the physical arrest of Deacon Hollman.

176. Defendant City of Atlanta is liable for the ministerial failures of the person or persons who were monitoring Defendant Kimbrough's body-worn camera video and who did not require the presence of a supervisor at the scene before Defendant Kimbrough proceeded with the physical arrest of Deacon Hollman.

177. Due to the failure to notify and require the presence of a supervisor at the scene, Deacon Hollman suffered injuries, death, and resulting damages.

178. Based on the actions described in this Count of the Complaint, Defendants City of Atlanta and Kimbrough are liable for Deacon Johnny Hollman's injuries, death, special damages recoverable by Deacon Hollman's estate, pre-death pain and suffering damages recoverable by Deacon Hollman's Estate, and the full value of Deacon Hollman's life (economic and intangible).

## COUNT II
## Plaintiffs' Fourth Amendment Excessive Force Claims against Defendant Kimbrough

179. Defendant Kimbrough violated Deacon Hollman's clearly established Fourth Amendment rights by using excessive force without actual or arguable reasonable suspicion or probable cause which every reasonable officer would have known would violate Deacon Hollman's rights, including but not limited to:

a. Defendant Kimbrough taking Deacon Hollman to the ground using a leg sweep maneuver, at which point Deacon Hollman had not committed any crime, much less a serious crime, and was not resisting, attempting to flee, or posing any threat whatsoever to anyone.

b. Defendant Kimbrough straddling Deacon Hollman's prone body, while Deacon Hollman repeatedly stated that he could not breathe, at which point Deacon Hollman had not committed any crime, much less a serious crime, and was not resisting, attempting to flee, or posing any threat whatsoever to anyone.

c.  Defendant Kimbrough striking Deacon Hollman in the head at least twice, with his closed fist, at which point Deacon Hollman had not committed any crime, much less a serious crime, and was not resisting, attempting to flee, or posing any threat whatsoever to anyone.

d.  Defendant Kimbrough tasing Deacon Hollman multiple times, at which point Deacon Hollman had not committed any crime, much less a serious crime, and was not resisting, attempting to flee, or posing any threat whatsoever to anyone.

e.  Defendant Kimbrough permitting a tow truck driver to straddle and sit on Deacon Hollman's head and neck, while Deacon Hollman was lying on the ground in a prone position, at which point Deacon Hollman had not committed any crime, much less a serious crime, and was not resisting, attempting to flee, or posing any threat whatsoever to anyone.

180.  Every reasonable officer would have known that based on the totality of the circumstances confronting Defendant Kimbrough at the time force was used, each of the *Graham* factors weighed against the use of <u>any</u> force and that the force used by Defendant Kimbrough was objectively unreasonable and grossly disproportionate and gratuitous.

181.  Every reasonable officer would have known that the force used by Defendant Kimbrough was objectively unreasonable and grossly disproportionate to

any law enforcement need and would violate Defendant Kimbrough's clearly established Fourth Amendment rights.

182.   Defendant Kimbrough is not entitled to qualified immunity for his use of excessive force in violation of clearly established law.

183.   As a direct and proximate result of Defendant Kimbrough's violations of clearly established law, Deacon Hollman was killed, and Plaintiffs suffered damages.

## COUNT III
## First Amendment Retaliation Claims against Defendant Kimbrough

184.   Defendant Kimbrough physically retaliated against Deacon Hollman because Deacon Hollman exercised his rights under the First Amendment to the United States Constitution.

185.   Specifically, Deacon Hollman: a) sought to record police activity by audio means and b) verbally contested Defendant Kimbrough's determination that he was responsible for causing the traffic accident.

186.   APD.SOP.2011 is titled "General Conduct." At Subsection 4.4.1 it provides as follows: "All employees shall be prohibited from interfering with a citizen's right to record police activity by photographic, video, or audio means. This prohibition is in effect only as long as the recording by the citizen does not physically interfere with the performance of an officer's duties."

187.   As pertains to Subsection 4.4.1 ADP.SOP.2011 provides: "This Subsection 4.4.1, may not be deleted, revised, or amended pursuant to the May 13, 2015 Order in Anderson v. City of Atlanta, et al. 1:11-CV-03398-SCJ. Consult the City of Atlanta Department of Law with any questions or concerns."

188.   As pertains to Subsection 4.4.1 ADP.SOP.2011 also provides: "This Subsection 4.4.1, may not be deleted, revised, or amended pursuant to the November 29, 2018 Order in Calhoun et al. v. Pennington, et al. 1:09-CV-3286-TCB. Consult the City of Atlanta Department of Law with any questions or concerns."

189.   The audio recording of the interaction between Defendant Kimbrough and Deacon Hollman did not physically interfere with Kimbrough's performance of his law enforcement duties.

190.   Deacon Hollman lawfully exercised his First Amendment right to audio record his interaction with Defendant Kimbrough as there was no physical interference with Kimbrough's performance of his law enforcement duties.

191.   Deacon Hollman exercised his First Amendment right to free speech by verbally contesting Defendant Kimbrough's determination that he was at fault for causing the minor traffic accident, and did so in a manner that did not threaten or incite violence, did not obstruct or impede Defendant Kimbrough or any other officer from performing his/her lawful duties, and did not violate any applicable law.

192. Deacon Hollman's verbally contesting Defendant Kimbrough's determination did not physically or otherwise interfere with Kimbrough's performance of his law enforcement duties.

193. Solely in retaliation against Deacon Hollman's exercise of his First Amendment rights, Defendant Kimbrough initiated the unlawful and malicious seizure of Deacon Hollman's person without actual or arguable reasonable suspicion or probable cause.

194. Solely in retaliation against Deacon Hollman's exercise of his First Amendment rights, Defendant Kimbrough physically assaulted Deacon Hollman by taking him to the ground in a leg sweep maneuver.

195. Solely in retaliation against Deacon Hollman's exercise of his First Amendment rights, Defendant Kimbrough twice struck Deacon Hollman in the head with his closed fist.

196. Solely in retaliation against Deacon Hollman's exercise of his First Amendment rights, Defendant Kimbrough tased Deacon Hollman.

197. Solely in retaliation against Deacon Hollman's exercise of his First Amendment rights, Defendant Kimbrough ignored Deacon Hollman's repeated complaints that he could not breathe.

198. Solely in retaliation against Deacon Hollman's exercise of his First Amendment rights, Defendant Kimbrough allowed a tow truck driver to straddle and

sit on Deacon Hollman's head and neck, while Deacon Hollman was in a prone position and after Deacon Hollman had repeatedly complained of an inability to breathe.

199.    At all material times herein, Defendant Kimbrough intended to punish Deacon Hollman for his protected speech.

200.    Defendant Kimbrough's retaliatory motive was the exclusive and/or substantial motivating factor behind Deacon Hollman's seizure and arrest.

201.    Defendant Kimbrough's retaliatory motive was the exclusive and/or substantial motivating factor behind Kimbrough's ignoring of Deacon Hollman's repeated complaints that he could not breathe.

202.    Defendant Kimbrough's retaliatory motive was the exclusive and/or substantial motivating factor behind the physical striking, tasing, and allowing the tow truck driver to straddle and sit on Deacon Hollman's head and neck, even after Deacon Hollman repeatedly complained of an inability to breathe.

203.    Defendant Kimbrough's retaliatory motive was the exclusive and/or substantial motivating factor behind the physical injuries he caused Deacon Hollman to suffer.

204.    Defendant Kimbrough's retaliatory motive was the exclusive and/or substantial motivating factor behind the misconduct that caused Deacon Hollman's death.

205.   Based on clearly established law, every reasonable officer would have known that Defendant Kimbrough's conduct would violate the First Amendment.

206.   Defendant Kimbrough is not entitled to qualified immunity and is liable for his violation of Deacon Hollman's clearly established First Amendment rights.

## COUNT IV

### § 1983 Claims against City of Atlanta for its
### Unconstitutional Official Arrest Policy

207.   O.C.G.A. § 40-13-2.1 (a) provides as follows:

> "A person who is issued a citation as provided in this chapter or Code Section 17-6-11, relating to display of driver's license in lieu of bail, shall sign the citation to acknowledge receipt of the citation and of his or her obligation to appear for trial. The officer shall advise the person that signing the citation is not an admission of guilt and that failure to sign will result in the person having to post a cash bond. If the person refuses to sign the citation, it shall constitute reasonable cause to believe that the person will not appear at trial and the officer may bring the person before a judicial officer or traffic violations bureau to post a bond as is otherwise provided by law."

208.   On August 10-11, 2023, City of Atlanta Police officers were authorized to arrest citizens for mere refusal to sign a traffic citation without complying with the

notice requirements of O.C.G.A. § 40-13-2.1. This practice was then, the official policy, custom, or practice of Defendant City of Atlanta.

209.   When Defendant Kimbrough was terminated as a City of Atlanta police officer by the City's Chief of Police, he was not terminated, in whole or in part, for failing to comply with the notice requirements of O.C.G.A. § 40-13-2.1.

210.   By not basing Defendant Kimbrough's termination, in whole or in part, on his failure to comply with the notice requirements of O.C.G.A. § 40-13-2.1, Defendant City of Atlanta ratified Defendant Kimbrough's failure to comply with the notice requirements with respect to Deacon Hollman.

211.   Absent a warrant or individualized probable cause that a person willfully and knowingly engaged in conduct prohibited by O.C.G.A. § 40-13-2.1, the Fourth Amendment prohibits the arrest of any person who did not willfully and knowingly violate O.C.G.A. § 40-13-2.1.

212.   At all material times herein, Defendant Chief Schierbaum was the Chief of Police and final policymaker for the City of Atlanta with final decision-making authority as to the City's performance of its police functions, including but not limited to enforcement of O.C.G.A. § 40-13-2.1.

213.   Pursuant to his authority as Chief of Police, Defendant Chief Schierbaum had authority to enforce O.C.G.A. § 40-13-2.1.

214.   Because Defendant Chief Schierbaum was not vested with any legislative or executive powers under O.C.G.A. § 40-13-2.1, he had no authority to establish any additional regulations or guidelines beyond the plain language of O.C.G.A. § 40-13-2.1 but was instead required to enforce the terms of the statute as written.

215.   In his capacity as final policymaker, Chief Schierbaum implemented a facially unconstitutional arrest policy which expressly instructed all APD officers to enforce O.C.G.A. § 40-13-2.1 without individualized probable cause and regardless of any particular person's conduct (the "Arrest Policy").

216.   Pursuant to the Arrest Policy, Chief Schierbaum expressly instructed Atlanta Police Department ("APD") officers to collectively treat <u>everyone</u> they issued a traffic citation to, as willfully and knowingly violating the Arrest Policy, whether or not the officer complied with the notice requirements of O.C.G.A. § 40-13-2.1.

217.   Defendant Chief Schierbaum had no legitimate basis to believe that every individual who verbally contested a traffic citation in the presence of the issuing officer, was knowingly or willfully violating O.C.G.A. § 40-13-2.1.

218.   O.C.G.A. § 40-13-2.1 did not authorize any APD officer to make a misdemeanor arrest of any person for merely verbally contesting the issuance of a traffic citation.

219.   The Arrest Policy expressly instructed APD officers to make warrantless arrests of Deacon Hollman and every person issued a traffic citation who verbally

contested the citation to the issuing officer, regardless of whether any such person knowingly or willfully violated O.C.G.A. § 40-13-2.1.

220.   The Arrest Policy constituted the official policy of the City of Atlanta.

221.   During a traffic investigation, the Arrest Policy vested APD officers issuing citations with unfettered discretion and authority to arbitrarily arrest any person who verbally contested the issuance of a traffic citation to the issuing officer.

222.   The Arrest Policy was communicated to officers such that Defendant Kimbrough that pursuant to Defendant Chief Schierbaum's Arrest Policy, they had unfettered discretion to arrest any citizen who verbally contested the issuance of a traffic citation, even where the citizen expressly stated an intention to sign the traffic citation.

223.   Defendant Kimbrough unlawfully arrested Deacon Hollman pursuant to the Arrest Policy for merely verbally contesting the validity of the issuance of the citation, without individualized probable cause that Deacon Hollman had willfully violated O.C.G.A. § 40-13-2.1 or any other law.

224.   The Arrest Policy is unconstitutional on its face and as applied to Deacon Hollman.

225.   At all times material herein, it was clearly established that APD police officers were prohibited from arresting any person without individualized probable cause that such person violated a valid law.

226.   No reasonable officer could have believed Deacon Hollman was willfully or knowingly violating any provision contained in O.C.G.A. § 40-13-2.1.

227.   Defendant Kimbrough did not provide Deacon Hollman with notice as required by law and did not provide Deacon Hollman with reasonable opportunity to comply with his directive to sign the traffic citation.

228.   The City's unconstitutional Arrest Policy was the moving force behind Defendant Kimbrough's violation of Deacon Hollman's constitutional rights which caused his injuries and death, and Defendant Kimbrough and Defendant City of Atlanta are liable for all damages arising therefrom.

## COUNT V

### § 1983 Claims against Defendant City of Atlanta for Unofficial Policy of Deliberate Indifference to Widespread Pattern and Practice of Excessive Force and Inadequate UOF Investigations

229.   At all relevant times herein, Defendant Schierbaum, as the Chief of Police, was the final policymaker for the City of Atlanta with final decision-making authority with regard to training, supervision, and discipline of officers employed by the City and the Atlanta Police Department ("APD"), establishing and implementing the written policies and procedures governing APD police officers (Standard Operating Procedures), and managing, directing, and controlling the operations, disciplinary process, and administration of The Office of Professional Standards ("OPS") and the Department as a whole.

230.   At all times material herein, Defendant Darin Schierbaum was the Chief of Police for the City of Atlanta. In June 2022 Mayor Andre Dickens appointed Darin Schierbaum to serve as Interim Chief of Police following the retirement of Chief Rodney Bryant. Schierbaum was appointed to be the 26th Chief of the Atlanta Police Department by Mayor Dickens in October 2022.

231.   At all material times herein, the City's SOPs required APD officers to report each use of force to their immediate supervisors, and APD supervisors were required to respond to the scene, initially review the use of force, and prepare a Use of Force Report by the end of that shift.

232.   A meaningful, constitutionally adequate UOF investigation cannot be completed by an APD supervisor in one shift.

233.   APD supervisors were required to initiate a constitutionally adequate UOF investigation by forwarding the subordinate officer's use of force to OPS investigators to conduct a proper UOF investigation and determine whether the officer's use of force was lawful, justified, and in compliance with the SOPs.

234.   OPS investigators are required to thoroughly investigate all uses of force forwarded to them by an APD supervisor, as well as all citizen complaints, to ultimately determine whether the use of force was lawful, justified, and in compliance with the SOPs.

235.   At all material times herein, Defendant Chief Schierbaum had knowledge that APD officers throughout the department were routinely using unjustified force against citizens with impunity and without consequences, and that these uses of force were routinely not being investigated in a meaningful or constitutionally adequate manner by APD supervisors and/or OPS investigators.

236.   Between 2017 and 2020, APD officers reported using non-deadly physical force[3] on approximately 1,274 different occasions (excluding incidents only involving Force Entry or Firearms).

237.   Approximately 1,212 of those 1,274 reported UOF incidents (95%) were rubber-stamped and approved by the officer's immediate supervisor without forwarding the same to OPS for a UOF investigation, and without any disciplinary action or remedial training imposed against the officer.

238.   Proper usage and analysis of the use of force incident reports may reveal patterns or trends that could indicate training needs, equipment upgrades, and/or policy modifications.

239.   With its rubber-stamping and almost rote approval by the officer's immediate supervisor without forwarding the same to OPS for UOF investigation, and without any disciplinary action or remedial training imposed against the officer,

---

[3] These include physical force such as punching or taking a suspect to the ground, use of a CEW/Taser, ASP baton, and/or OC spray, which are each subject to the same UOF policies.

prevents a proper usage and analysis of the UOF reports to potentially reveal patterns or trends that could indicate training needs, equipment upgrades, and/or policy modifications.

240.    At all material times herein, Defendant Chief Schierbaum had knowledge that APD supervisors throughout the department were routinely rubber-stamping and approving of an officer's reported use of force without consideration of the objective *Graham* factors to determine whether the force used was objectively reasonable and proportionate to the need for force in light of the totality of circumstances, including the severity of the crime at issue and the extent to which the suspect was actively resisting.

241.    At all material times herein, Defendant Chief Schierbaum had knowledge that APD supervisors throughout the department were routinely rubber-stamping and approving of gratuitous uses of force against suspects who were handcuffed and/or who otherwise were not actively resisting or posing any physical threat, in clear violation of the Fourth Amendment.

242.    At all material times herein, Chief Schierbaum had knowledge that APD supervisors throughout the department were routinely rubber-stamping and approving of officers using physical force and tasing citizens in clear violation of the City's SOPs and the Fourth Amendment.

243.  OPS  investigators  are  required  to  conduct  meaningful  UOF investigations with the ultimate purpose of determining whether citizen complaints alleging the use of excessive force are true and whether the officer's use of force was otherwise lawful and in compliance with the SOPs.

244.  As a matter of widespread and persistent pattern and practice, OPS investigators routinely failed to determine whether citizen complaints alleging the use of excessive force were true and routinely failed to determine whether the officer's use of force was lawful and in compliance with the SOPs.

245.  OPS investigators are authorized to make the following dispositions to close a UOF investigation:

   a.  EXONERATED - the conduct was determined to be justified, lawful and proper

   b.  NOT SUSTAINED - the investigation did not develop sufficient information to prove or disprove the allegation(s) stated in the complaint with regard to employee work rule 4.2.50 (Maltreatment or Unnecessary Force).

   c.  SUSTAINED - the investigation did develop sufficient information to prove the allegation(s) stated in the complaint.

   d.  UNFOUNDED - the allegation(s) were without factual basis.

   e.  EXCEPTIONALLY CLOSED

246.  As a matter of widespread and persistent pattern and practice, OPS investigators routinely closed UOF investigations with a final disposition of "NOT SUSTAINED" without making any determination as to whether the force was lawful or otherwise in compliance with the City's SOPs, and in each such case, APD took no further investigatory, disciplinary, or remedial action against the officer.

247.  A UOF investigation with a final disposition of "NOT SUSTAINED" is meaningless and confirms that in each such instance, OPS investigators failed to conduct a constitutionally adequate investigation and instead prematurely closed the investigation without proving or disproving the UOF allegations against the officer, and without any determination as to whether the officer's use of force was lawful and proper or otherwise in compliance with APD's policies.

248.  When a UOF allegation is NOT SUSTAINED, Defendant Chief Schierbaum had knowledge that as a matter of widespread and persistent pattern and practice, APD did not impose any further disciplinary action, increased supervision, or remedial training on the officer.

249.  Defendant Chief Schierbaum had knowledge that APD treated a final disposition of "NOT SUSTAINED" the same as if the use of force had been determined by OPS to be lawful and proper.

250.  As a matter of official policy and widespread pattern and practice, Defendant Chief Schierbaum had knowledge that when preparing an officer's

Disciplinary Worksheet in connection with any OPS UOF investigation APD supervisors and OPS investigators do not and are not required to consider any prior UOF allegations that were "NOT SUSTAINED."

251.   As a matter of widespread and persistent pattern and practice, Defendant Chief Schierbaum had knowledge that OPS investigators routinely closed UOF investigations with a disposition of "NOT SUSTAINED," without making any effort to develop readily available information which would definitively prove or disprove the UOF allegation against the officer.

252.   For example, Defendant Chief Schierbaum had knowledge that OPS investigators routinely disposed of UOF allegations as "NOT SUSTAINED" without interviewing the complainant and/or other available civilian witnesses.

253.   Similarly, and as a matter of widespread and persistent pattern and practice, Defendant Chief Schierbaum had knowledge that OPS investigators routinely failed to administer readily-available Computer Voice Stress Analysis ("CVSA") exams to officers in connection with UOF investigations which did not otherwise have available video footage or other evidence to resolve discrepancies between the victim's and the officer's conflicting version of events, and as a matter of widespread and persistent pattern and practice, instead prematurely closed those UOF investigations with a disposition of "NOT SUSTAINED".

254.   Defendant Chief Schierbaum had knowledge that in connection with UOF investigations which do not otherwise have available video footage or other evidence to resolve discrepancies between the victim's and the officer's conflicting version of events, the results of a CVSA exam would provide OPS investigators with objective data as to the veracity of each person's version of events and would prove or disprove the UOF allegations against the officer.

255.   In the rare circumstance wherein OPS investigators did choose to administer a CVSA exam to an officer during a UOF investigation, Defendant Chief Schierbaum had knowledge that as a matter of widespread and persistent pattern and practice, OPS investigators routinely disregarded the results of CVSA exams which clearly indicated that the officer was lying and instead disposed of the UOF investigation as "NOT SUSTAINED".

256.   In the rare circumstance wherein a UOF allegation is "SUSTAINED" against an officer, Defendant Chief Schierbaum had knowledge that as a matter of widespread and persistent pattern and practice, OPS investigators routinely violated the City's written disciplinary policies & SOPs and modified the mandatory minimum discipline to impose less severe discipline than required. For example, in connection with OPS File # 19-1-0026-UAF, OPS investigators "SUSTAINED" a serious UOF violation against an officer, a Category C-D violation which requires a minimum mandatory 4 to 16 day suspension; in accordance with APD's widespread and

persistent pattern and practice and in violation of the City's SOPs, APD modified the mandatory disciplinary action against the officer from a 4-day suspension to an unauthorized written reprimand, the least severe form of disciplinary action that can be imposed against an APD officer for even a minor Category A work rule violation. OPS routinely modified disciplinary action to impose less severe and unauthorized disciplinary action for a sustained UOF violation in several other instances in this same manner.

257.   Defendant Chief Schierbaum had knowledge that OPS investigators also routinely disposed of allegations of serious UOF violations by amending and investigating the same as a less serious and more obscure allegation of a minor work rule violation such as Work Rule 4.1.1 – Appropriate Action Required, which requires, in relevant part, that all employees "[p]erform[] official acts in a lawful, restrained, dignified, impartial, and reasonable manner", or Work Rule 4.2.33 – Conformance to Directives, which requires that all employees "familiarize themselves with, and conform to, the rules, regulations, directives, and standard operating procedures of the Department."

258.   In addition, and by way of example only, APD failed to conduct meaningful investigations of the following complaints wherein multiple officers were alleged to use gratuitous, excessive force without justification:

a.  On May 7, 2003, an uninterested bystander observed APD Officer Mark Gardner strike a handcuffed arrestee (David Childs) in the face with his knee and/or his gun while the arrestee was seated inside the Zone 3 precinct where surveillance videos were installed (the "Childs incident"), and informed APD of the same; despite the bystander's willingness to submit to a lie detector test to confirm his veracity, APD did not perform a lie detector test, and did not review the available surveillance video footage which would have confirmed or denied the allegation against Gardner; APD had knowledge that the head wounds Childs sustained during his arrest suddenly re-opened and began bleeding again while he was handcuffed at the precinct, but did not make any inquiry as to how the arrestee was re-injured at the precinct. APD opened and closed its investigation without confirming or denying whether the allegation that Gardner used excessive force at the precinct was true.

b.  On July 1, 2006, an arrestee (Raymond Clay) informed APD that Mark Gardner struck him in the head with a two-way radio and kicked him while he was not resisting. APD opened and closed its investigation without confirming or denying whether the allegation that Gardner used excessive force was true.

c. On November 10, 2006, Jermichael Lockette informed APD that 2 APD officers – Ivory Streeter and/or Val Lester - used excessive force by suddenly punching him in the face and ripping out four dreadlocks from his head during an investigatory stop (the "Lockette incident").

   i. Although both officers denied striking Lockette and claimed that they were unaware how he had sustained his confirmed injuries, APD administered a Computer Voice Stress Analysis ("CVSA") to both officers on March 16, 2007, which indicated deception when the officers denied using force against Lockette.

   ii. Based on the officers' deception, on or about May 21, 2007, APD concluded that the allegations of excessive force were SUSTAINED and issued oral reprimands to both officers.

d. On November 4, 2008, APD administered a CVSA to Lockette, which confirmed that no deception was indicated with regard to his allegations regarding the officers' use of force.

e. On December 24, 2008, APD prepared a new Investigation Disposition Form for the Lockette incident which, without explanation, now concluded that Streeter and Lester used reasonable force and recommended that the allegation that the officers punched Lockette in the face and pulled his

dreadlocks out from his head be rescinded and changed to "NOT SUSTAINED."

    i. Without offering any explanation, on or about June 15, 2009, APD adopted the recommendation and formally rescinded its prior finding that Streeter and Lester used excessive force by punching Lockette in the face and pulling his dreadlocks out from his head and changed the disposition in both officers' disciplinary files to "NOT SUSTAINED."

    ii. At no point was either officer investigated, reprimanded, or disciplined for failing to intervene in the other officer's sustained use of excessive force in connection with the Lockette incident.

  f. Karla Weems informed APD that on June 28, 2011, 4 APD officers from the Fugitive Unit broke through the front door of her home, handcuffed all occupants, and searched her home without a warrant. One of the handcuffed occupants, Mike Gibbs, informed APD that an officer dragged him outside and threw him to the ground, face-first, after he was handcuffed and not resisting. Another occupant, Rontavious Loyal, informed APD that another officer kicked him and threw him to the ground outside. The officers released all occupants after determining that the subject of their search was not present. APD did not subject any of the officers who were present to CVSDs

and instead closed its investigation without confirming or denying whether the allegation of excessive force was true.

g. Ezoeke Parks informed APD that on August 23, 2011, 2 APD Officers - Jose Vidal and Norattam Holden - beat her and her daughter, informing APD that: (i) Officer Vidal kicked her in her stomach, dragged and pulled her by her hair, and kneed her in her back during her arrest; and (ii) that Officer Holden grabbed her 14-year old daughter by her neck and kneed her in her stomach. The Atlanta Citizen Review Board (ACRB) concluded that there was sufficient evidence to sustain the citizen's allegations of excessive force against both officers and recommended to APD that the officers be suspended and undergo psychological evaluation. APD rejected the ACRB's recommendation, and instead concluded that there was insufficient evidence to sustain the allegations of excessive force against either officers without subjecting anyone to a CVSA. More specifically, APD explicitly concluded that pulling the citizen's hair was a reasonable "method to ensure that she was handcuffed." APD did not investigate or discipline either officer for failing to intervene in the other's use of excessive force.

h. Bailey Cato informed APD that on September 14, 2014, 2 APD officers - Michael Soprano and Matthew Johns - pepper-sprayed him and repeatedly punched him in the face and beat him without provocation. APD and the

Chief rejected the ACRB's finding that the allegation that these 2 APD officers used excessive force and rejected ACRB's recommendation that the officers be suspended and receive additional training and did not impose any discipline on the officers for their use of excessive force. Moreover, APD did not investigate or discipline either officer for failing to intervene in the other's use of excessive force.

i.  Richard Williams informed APD that on March 31, 2015, after several APD officers in the Fugitive Unit stormed into his motel room to arrest him, an unidentified APD officer struck him in the head with a silver revolver while he was not resisting arrest. Despite confirming that the arrestee sustained a gaping two-inch headwound during his arrest which required treatment at the hospital, none of the officers present during the arrest could explain how Williams sustained said injury and provided conflicting accounts of the events that occurred during the arrest. APD did not subject any officers to CVSAs and instead closed its investigation without confirming or denying whether the allegation of excessive force was true.

j.  On May 30, 2020, City of Atlanta officers tased Taniyah Pilgrim multiple times while she was inside a vehicle, then pulled her from the vehicle and arrested her. The officers involved in this activity have been sued in the case of Taniyah Pilgrim and Messiah Young v. The City of Atlanta, et. al, USDC,

Northern District of Georgia, Atlanta Division, Civil Action No. 1:21-cv-02472-TWT. In sworn deposition testimony the following officers who were named as Defendants in that action admitted that Taniyah Pilgrim had done nothing wrong, had violated no law, and had done nothing to justify the use of any degree of force against her – Lonnie Hood, Mark Gardner, Ivory Streeter, Steven McKesey, Roland Claud, Orlando Cooper, Armon Jones, Willie T. Sauls, Jr., and Sheldon Drinkard. Despite the documented and indisputable use of force against Taniyah Pilgrim, Defendant City of Atlanta has not formally investigated or disciplined any of these officers for their excessive force employed against Ms. Pilgrim. Neither has Defendant City of Atlanta ever formally investigated or disciplined the supervisors of these defendant officers for their failures to initiate use of force investigations against the officers named as defendants in the lawsuit brought by Ms. Pilgrim. Further, Defendant City of Atlanta has failed to investigate or discipline any of these officers for failing to intervene in the others' use of excessive force.

259.   Another instance of misuse of the police disciplinary process is reflected in the case of Amber Jackson v. City of Atlanta, Officer Cody Swanger, and Officer Jeremiah Brandt, United States District Court, Northern District of Georgia, Atlanta Division, Civil Action File Number 1:21-cv-02578-MHC. On May 30, 2020, City of

Atlanta Police Officer Cody Swanger stopped a vehicle leaving a mall parking lot because the passenger in the vehicle moved an orange cone several feet so that her vehicle could exit the mall. Swanger drew his service weapon on the passenger and profanely directed her to exit the vehicle. Swanger forcefully pulled the female occupant from the vehicle, then lifted her in the air and body-slammed her to the concrete pavement, resulting in the female occupant, Amber Jackson, sustaining a broken right clavicle that required surgical repair. The Deputy Chief of Police originally recommended that Swanger receive a ten-day suspension for maltreatment or excessive force. The Assistant Chief of Police subsequently concurred with the recommended ten-day suspension. Nearly three months later, the Deputy Chief of Police reversed course and issued a two-day suspension to Swanger, citing Swanger's taking responsibility for his misconduct. Notably, this misconduct was captured on video and Swanger had no choice but to admit his misconduct. The other defendant in that case, Jeremiah Brandt was the initial recipient of a recommended three-day suspension for filing a false report to support the arrest of Ms. Jackson and sanitize Swanger's use of force against Ms. Jackson and failing to activate his body-worn camera. The recommended three-day suspension was reduced to a written reprimand.

260.   Regarding Deacon Hollman, Defendant Chief Schierbaum's publicly stated reason for terminating Defendant Kimbrough's employment as a City of Atlanta Police Officer was due to Kimbrough's failure on August 10-11, 2023 to call a

supervisor to the scene after Deacon Hollman requested that he do so. The termination announcement made no mention of Defendant Kimbrough's use of force against Deacon Hollman or of Deacon Hollman's death. Once again, Defendant City of Atlanta camouflaged its suppression of use of force by one of its officers in favor of citing an administrative violation.

261.   OPS similarly failed to conduct constitutionally adequate UOF investigations in multiple other instances between 2017 and 2023.

262.   Despite knowledge of the City's widespread and persistent pattern and practice of excessive force and failure to conduct meaningful UOF investigations, Defendant Chief Schierbaum turned a blind eye and took no remedial action.

263.   Defendant City of Atlanta's widespread and persistent pattern and practice of excessive force and failing to conduct meaningful UOF investigations was so widespread and persistent that it amounts to a municipal policy of deliberate indifference and was the moving force behind Defendant Kimbrough's use of excessive force against Deacon Hollman.

264.   Defendant City of Atlanta's widespread and persistent unconstitutional patterns and practices regarding the use of force instilled in Atlanta Police Officers the belief that they were permitted to use force against citizens with impunity and without any consequences.

265.    In connection with the subject incident, Defendant Kimbrough was acting pursuant to the City's official policy, custom, and/or practice of using gratuitous excessive force without recourse, which was the moving force behind their brazen use of gratuitous, excessive force against Deacon Hollman.

266.    As a direct and proximate result of the City's unconstitutional conduct, Deacon Hollman suffered injuries and death. Additionally, the Plaintiffs suffered damages for which Defendant City of Atlanta is liable under § 1983.

### Count VI

### Deliberate Indifference Under 42 U.S.C. § 1983

### Against Defendants – Failure to Provide Medical Care

267.  Defendant Kimbrough repeatedly tased Deacon Hollman, physically assaulted him, and applied, along with the tow truck driver, their collective body weight to his person, and ignored his repeated complaints that he could not breathe.

268.  After handcuffing Deacon Hollman and positioning him in a seated position, Defendant Kimbrough could see that Deacon Hollman remained motionless.

269.  After handcuffing Deacon Hollman and positioning him in a seated position, Defendant Kimbrough failed to render any medical aid to Deacon Hollman.

270.  It should have been clear to any reasonable law enforcement officer that Deacon Hollman had been injured and required immediate medical assistance and care.

271. Defendant Kimbrough failed to provide Deacon Hollman any medical attention whatsoever, even after it would have been clear to any reasonable law enforcement officer that he required immediate medical attention and care.

272. As described above, Defendant Kimbrough failed to ensure that Deacon Hollman received prompt and adequate medical care subsequent to the repeated tasings, physical assaults, and encounter-induced breathing problems he complained of and suffered.

273. Additionally, one or more of Defendant City of Atlanta's employees watched, in real time, Defendant Kimbrough's interaction with Deacon Hollman. As such, one or more of Defendant City of Atlanta's employees would have been aware that Deacon Hollman needed immediate medical attention and care. This employee or those employees of Defendant City of Atlanta failed to direct Defendant Kimbrough to render immediate medical aid to Deacon Hollman.

274. Defendant Kimbrough's actions exhibited deliberate indifference to Deacon Hollman's serious medical needs, were performed under color of state law, and violated Deacon Hollman's rights under the Fourteenth Amendment to the United States Constitution.

275. Defendant Kimbrough's failure to render aid to Deacon Hollman, not only violated constitutional requirements, but it also violated the Standard Operating Procedures of the Atlanta Police Department ("APD"). APD's Use

of Force Policy, APD.SOP.3010 at subsection 4.3.1 requires law enforcement officers to "render first aid, to the best of their training, to individuals who are injured or complain of an injury after a use-of-force incident until and EMT arrives." Defendant Kimbrough failed to do.

276. As a direct result of Defendant Kimbrough's actions in failing to ensure that Deacon Hollman received prompt and adequate medical care, Deacon Hollman was subjected to increased pain and suffering, preceding his death.

277. Defendant Kimbrough's conduct was willful and exhibited a flagrant disregard for Deacon Hollman's federally secured rights. Accordingly, Defendant Kimbrough is legally liable to the Plaintiffs under 42 U.S.C. § 1983.

## <u>COUNT VII</u>
### <u>Wrongful Death of Deacon Hollman Against All Defendants</u>

278.   As a direct, sole, and/or proximate cause of actions by Defendants, as described above, the Plaintiffs are entitled to recover any and all damages resulting from the wrongful death of Deacon Hollman, including but not limited to, the full value of Deacon Hollman's life, including economic damages, non-economic damages, and the loss of the enjoyment of living.

## COUNT VIII

## Estate Claims of Deacon Hollman Against All Defendants

279.   As a direct, sole, and/or proximate cause of actions by one or more of the Defendants and/or as described above, the estate of Deacon Johnny Hollman, of which Plaintiff Wilson is the administrator, is entitled to recover any and all damages resulting from Deacon Hollman's conscious pre-death pain and suffering, shock and fright, anxiety, funeral and burial expenses, and last expenses.

## COUNT IX

## State Law Claims for Assault and Battery against

## Defendant Kimbrough

280.   Defendant Kimbrough used a Taser, along with physical force, to commit a violent, serious, and ultimately deadly bodily injury on Deacon Hollman, and took other actions which placed Deacon Hollman in reasonable apprehension of immediately receiving a violent injury, which constitutes an assault and/or battery under Georgia law.

281.   Defendant Kimbrough also permitted a non-law enforcement citizen tow truck driver to straddle and sit on Deacon Hollman's head and neck, while Defendant Kimbrough and the tow truck driver jointly physically suppressed and handcuffed Deacon Hollman.

282.   Defendant Kimbrough further permitted the non-law enforcement citizen tow truck driver to physically grab Deacon Hollman's arm and assist in handcuffing and arresting Deacon Hollman.

283.   Deacon Hollman suffered physical and emotional injuries and died as a result of the Defendants' conduct complained of herein. The Plaintiffs are entitled to recover damages as a direct and proximate result thereof.

284.   Defendants acted with intent and with actual malice to injure and are thus not entitled to official immunity and are liable for assault and/or battery.

## COUNT X

## State Law Claims for False Imprisonment and/or False Arrest against Defendant Kimbrough

285.   Defendant Kimbrough deprived Deacon Hollman of his liberty by unlawfully detaining and/or arresting Deacon Hollman without justification, which constitutes false imprisonment under Georgia law.

286.   Deacon Hollman suffered injuries and death. The Plaintiffs are entitled to recover damages as a direct and proximate result thereof.

287.   Defendants acted with intent and with actual malice to injure and are thus not entitled to official immunity and are liable for false imprisonment.

## COUNT XI

## Punitive Damages against the Individual Defendants

288.   Plaintiffs hereby incorporate and reallege each of the Paragraphs alleged above as if fully restated herein.

289.   The Individual Defendants' conduct as described herein evidences willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care which is sufficient to establish that the Individual Defendants acted with conscious indifference to the consequences of their actions.

290.   At all material times herein, the Individual Defendants acted with malice and/or reckless indifference to Deacon Hollman's federal rights.

291.   Plaintiffs are entitled to an award of punitive damages under state and federal law.

## COUNT XII

## Attorney's Fees

292.   Plaintiffs hereby incorporate and reallege each of the Paragraphs alleged above as if fully restated herein.

293.   Plaintiffs are entitled to an award of attorney's fees under § 1988 and Georgia law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for the following:

a)  A trial by jury;

b)  A judgment in favor of the Plaintiffs for all damages recoverable under the law and as determined by the jury;

c)  A judgment in favor of Johnny Hollman Sr.'s estate for all damages recoverable under the law and as determined by the jury;

d)  A judgment for the full value of Johnny Hollman, Sr.'s life;

e)  For the recovery of attorney's fees and the expenses of litigation under §1988 and state law;

f)  Punitive damages in an amount to be determined by the jury and as allowed by law;

g)  For all costs to be cast against the Defendants;

h)  For all such further and general relief which this Court deems just and proper.

PLAINTIFFS' COMPLAINT FOR DAMAGES

Respectfully submitted this 18th day of January, 2024.

*/s/ Harold W. Spence*
HAROLD W. SPENCE
Georgia Bar No. 671150
MAWULI M. DAVIS
Georgia Bar No. 212029
*BRITTNEY R. DOBBINS
*Pro Hac Vice application
forthcoming
*Attorneys for Plaintiffs*

**THE DAVIS BOZEMAN LAW FIRM, P.C.**
4153 - C Flat Shoals Parkway, Suite 332
Decatur, Georgia 30034
(404) 244-2004- Office
(404) 244-2020- Facsimile
hspence@davisbozemanlaw.com
mdavis@davisbozemanlaw.com
bdobbins@davisbozemanlaw.com

PLAINTIFFS' COMPLAINT FOR DAMAGES